## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRYAN JAMES NOVACO,
        *Plaintiff*,

    v.

NANCY A. BERRYHILL,                                    No. 3:16-cv-1918 (VAB)
*Acting Commissioner of Social Security*,
        *Defendant*.

## RULING AND ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Bryan James Novaco ("Plaintiff") filed this administrative appeal under 42 U.S.C.

§ 405(g) against the Acting Commissioner of Social Security ("Defendant" or "the Acting

Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA")

denying his claim for Title II disability insurance benefits under the Social Security Act.

Complaint, dated Nov. 21, 2016 ("Compl."), ECF No. 1.

Mr. Novaco moves for a judgment on the pleadings reversing the decision of the Acting

Commissioner. Motion for Judgment on the Pleadings, dated Apr. 14, 2017 ("Pl.'s Mot."), ECF

No. 13; Memorandum in Support of Pl.'s Mot., dated Apr. 14, 2017 ("Pl.'s Mem."), ECF No. 14.

The Acting Commissioner moves for an order affirming her decision. Motion for an Order

Affirming the Decision of the Commissioner, dated Jun. 13, 2017 ("Def.'s Mot."), ECF No. 16;

Memorandum in Support of Def.'s Mot., dated June 13, 2017 ("Def.'s Mem."), ECF No. 16-1.

For the reasons explained below, Mr. Novaco's motion is **GRANTED IN PART AND**

**DENIED IN PART**. His motion is granted with respect to the Acting Commissioner's Step Five

finding, but denied as to his other claims of error. The Acting Commissioner's motion is

**DENIED**. The decision of the Acting Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this decision.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

Mr. Novaco, now 40 years old, lives in East Haven, Connecticut. Tr. 48. He has two years of college education and has worked as a pet store shift manager, a restoration cleaner, and a warehouse inventory manager. Tr. 36, 225, 267. He alleges that he became disabled and unable to work on August 11, 2012. Tr. 211–12.

Mr. Novaco suffers from at least three identified mental health conditions: depressive disorder, anxiety disorder, and personality disorder. The ALJ also identified an additional mental impairment related to cannabis dependence.

Since August 2012, Mr. Novaco has not worked. He now seeks review of the Acting Commissioner's denial of his application for benefits under Title II.

#### 1.     Medical Evidence

Mr. Novaco has a history of mental health treatment with multiple providers. Tr. 282. During the entire relevant period, he primarily received outpatient treatment at Bridges Community Support System ("Bridges"). Joint Statement of Material Facts, dated Apr. 14, 2017 ("J. SMF"), ECF No. 15, at 3.

On August 30, 2012, psychologist Paula Leshine referred Mr. Novaco for a psychiatric evaluation, medication management, and therapy for symptom management. Tr. 282. She noted that Mr. Novaco had a "[l]ongstanding history of psych[iatric] treatment, with multiple providers," and noted that he experienced "severe anxiety, mood regulation problems, [and] minimal appetite." *Id.* She also noted that Mr. Novaco's "[w]ork history [was] impaired by

2

anxiety," and that he reported a "[l]imited effectiveness of medication currently and with past medications." *Id.* She diagnosed Mr. Novaco with generalized anxiety disorder, rule-out panic disorder with agoraphobia and bipolar disorder. *Id.* He had been taking Klonopin. *Id.*

On September 6, 2012, Mr. Novaco visited Dr. Leshine again. Tr. 281. She noted that Mr. Novaco's anger with his psychiatrist, Dr. Charney, for failing to return Mr. Novaco's phone calls, and that he was scheduled to meet with Dr. Charney later that day. Tr. 281. Dr. Leshine found that Mr. Novaco had extreme anxiety and noted that he had expressed suicidal and homicidal thoughts, toward Dr. Charney. *Id.* Rather than see Dr. Charney, later that day, "given his current state," Mr. Novaco reported to the emergency room. *Id.*

Mr. Novaco was then admitted to Yale-New Haven Hospital, after expressing a desire to hurt Dr. Charney. Tr. 291, 294. He stayed under in-patient care for ten days until he was stable enough to discharge. *Id.* During that time, he reduced his usage of Klonopin and began to take Depakote. Tr. 292. His discharge summary stated that he "has had multiple admissions, although none recently with his last reportedly at Yale Psychiatric Hospital in 1999." Tr. 291.

The discharge summary also noted that Mr. Novaco had overdosed twice in the past, and a possible third in 2003, that he has a history of violence, and that he "reported a past feeling that his anger 'went through the roof' when he was prescribed Zoloft." *Id.* Furthermore, Mr. Novaco had been treated in the past with other medications. *Id.* While Mr. Novaco did not provide "a history of distinct manic episodes, but does have a history of episodes of feeling irritable and full of rage." *Id.* The discharge summary also noted that he had a recent history of using cannabis: he had been using cannabis daily, he had stopped for a few weeks, and he had relapsed the day before he was admitted. *Id.* He was advised to continue to seek follow-up treatment at Bridges. Tr. 293.

On September 24, 2012, Mr. Novaco returned to Bridges and met with licensed clinical social worker Isabelle Breen, an intake clinician at Bridges. Tr. 416–25. He had the following symptoms: depressed mood, grief, hopelessness, worthlessness, guilt, anxiety, panic attacks, obsession/compulsions, irritability, sleep disturbance, and substance use. Tr. 420. He was also well-groomed, cooperative, anxious, agitated, his speech was normal, and his thought process was intact. Tr. 421. Ms. Breen noted Mr. Novaco's suicidal and homicidal ideation. Tr. 422. Ms. Breen diagnosed him with a mood disorder, not otherwise specified ("NOS"), an anxiety disorder NOS, and cannabis dependence in remission. Tr. 424. She also assessed a Global Assessment of Functioning ("GAF") score[1] of 38.[2] Ms. Breen recommended one-on-one therapy for coping with his mood disorder and medication management. Tr. 425.

Mr. Novaco met with licensed clinical social worker Larry Cerrato at Bridges for therapy a number of times starting in the fall of 2012.

On November 8, 2012, Mr. Novaco reported a long history of mood swings, obsessive-compulsive behavior, a history of agoraphobia, and that he tended to move from job to job, spending only two or three years at each. Tr. 426. Mr. Cerrato noted that Mr. Novaco was well-

---

[1] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000)). "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning[,]" *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010), with "ranging from 0 (lowest functioning) through 100 (highest functioning)[,]" *Mainella v. Colvin*, No. 13-CV-2453-JG, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014). While GAF scores are no longer included in the *Diagnostic and Statistical Manual of Mental Disorders*, and the SSA limits their use, *see* S.S.A. Administrative Message 13066 (eff. Jul. 22, 2014; rev. Oct. 14 2014), these scores are still useful, however, "as opinion evidence, i.e., the details of the clinician's description rather than a numerical range." *Packard v. Berryhill*, No. 16-cv-00560V (F), 2018 WL 3651330, at *7 (W.D.N.Y. Aug. 1, 2018); *see Martin v. Berryhill*, No. 17-CV-00267-LGF, 2018 WL 3439867, at *5 (W.D.N.Y. July 17, 2018).

[2] "A GAF score of 31 to 40 indicates '[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgement, thinking or mood (e.g., depressed person avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).'" *Parker v. Colvin*, No. 3:13-cv-1398 (CSH), 2015 WL 928299, at *6 n.10 (D. Conn. Mar. 4, 2015).

groomed, on time, alert, engaged, and that he recognized his feelings. *Id.* Mr. Cerrato also noted that Mr. Novaco's mood was depressed and anxious. *Id.* Mr. Novaco was taking Depakote and Klonopin, and smoking marijuana. *Id.*

On November 13, 2012, Mr. Cerrato's evaluation of Mr. Novaco was unchanged since the previous week, and he noted that Mr. Novaco was "motivated [and] doing ok considering circumstances." Tr. 428.

On November 19, 2012, Mr. Cerrato noted that Mr. Novaco was again well-groomed, prompt, alert, and engaged. Tr. 430. Mr. Cerrato also recorded that Mr. Novaco was anxious and depressed.[3] *Id.* Mr. Novaco also discussed some bipolar traits, including hypomania and depression. *Id.*

On December 11, 2012, Mr. Novaco felt depressed, feared going outside, and felt he had too much spare time. Tr. 436. They continued to meet through January, and Mr. Cerrato marked no significant changes. Tr. 344–46.

On February 5, 2013, Mr. Novaco reported that he went out every day, that people were helping him and he wished he could help others, and that he was "doing much better this week." Tr. 347, 444.

On February 19, 2013, Mr. Novaco reported that he was sleeping poorly and not eating, and that he had "passive ideation, not plan or intent," and Mr. Cerrato noted that Mr. Novaco had a depressed and anxious mood. Tr. 348.

That same day, Dr. Rafique Tai, M.D., a psychiatrist at Bridges, evaluated Mr. Novaco. Tr. 413–15. Mr. Novaco told Dr. Tai that he had anxiety, and that he had used Depakote,

---

[3] The same report notes that Mr. Novaco was "euthymic," i.e., non-depressed, but the parties' statement of material facts describes Mr. Novaco's mental status examination only as revealing "an anxious and depressed mood." J. SMF at 5.

Klonopin, and marijuana to relieve his anxiety. Tr. 341. Dr. Tai noted that Mr. Novaco's thought content focused on anxiety, that he had a mildly anxious mood, and that he had poor insight. Tr. 342. Dr. Tai also noted that Mr. Novaco's thought process was goal-oriented, that he was cooperative and responsive, that he was vague about his history, and that he did not exhibit a thought disorder. *Id.* Dr. Tai diagnosed Mr. Novaco with generalized anxiety disorder and prescribed Citalopram. *Id.*

On March 7, 2013, Mr. Novaco met with Mr. Cerrato, and stated that he was "off all [his] meds," because he did not want to deal with them, and that he was finding that he was "a real mean person off meds" and "more confrontational." Tr. 350. He did not report homicidal or suicidal ideation. *Id.*

On March 12, 2013, Mr. Novaco stated that he was still not taking his medications, and that he had stopped using synthetic marijuana because of its side effects. Tr. 352. He reported "high anxiety," that he had been anxious all weekend, and said, "the good thing is I realized I want to live." *Id.*

At therapy, on March 19, 2013, Mr. Novaco felt that he didn't deserve to be alive. Tr. 351. He had an anxious and depressed mood, and a flat affect. *Id.* Several months later, on July 23, 2013, he stated that he could not seem to get control of his moods, that he had not slept in two days, was not eating, and that he had not been taking any medications for ten months. Tr. 358. He also requested assistance with his disability insurance benefits application. Tr. 359.

He continued therapy through the summer without significant changes to his reports. *See* Tr. 353–60, 474.

On September 3, 2013, Mr. Cerrato completed a report for the Social Security Administration. Tr. 332–35. He noted that Mr. Novaco had made slight improvements, since he

began weekly therapy appointments one year earlier, and that he was not taking medications. Tr. 332. He listed Mr. Novaco's diagnoses as mood disorder, rule out bipolar disorder, and cannabis abuse. *Id.* He also stated that cannabis had a very calming effect on Mr. Novaco's conditions. *Id.* He also noted that Mr. Novaco was thin and gaunt, had poor short-term memory, adequate judgment and insight, a depressed and anxious mood, and a flat affect. Tr. 332-33.

Mr. Cerrato opined that Mr. Novaco had a "very serious problem" in his ability to cope with the ordinary demands of a work environment, to handle frustration appropriately, and that he had a history of yelling at co-workers and customers and a history of homicidal ideation toward his former psychiatrist. Tr. 333. Mr. Cerrato also stated that Mr. Novaco had a very serious problem handling frustration appropriately, as well as a very serious problem performing work activity on a sustained basis, i.e., eight hours a day, five days a week. *Id.*

Mr. Cerrato reported that Mr. Novaco has an obvious problem in his ability to get along with others without distracting them or exhibiting behavioral extremes and in his ability to perform basic work activities at a reasonable pace and finish on time, due to periodic mood swings involving low frustration tolerance, agoraphobic tendencies, and poor concentration and memory. Tr. 334. During stable periods, he explained, Mr. Novaco generally got along with supervisors and did not have a problem using good judgment about safety and dangerous circumstances or carrying out single-step or multiple-step instructions. Tr. 333–34. The report also noted that Mr. Novaco had a slight problem caring for his physical needs and responding appropriately to authority. *Id.*

On September 10, 2013, Dr. Tara Kerner, M.D., a supervising psychiatrist at Bridges, co-signed Mr. Cerrato's September 3, 2013 report. Tr. 335; J. SMF at 7.

On September 24, 2013, Mr. Novaco met with Mr. Cerrato and stated that he felt like he was "losing it" and that he was "in the fight or flight response 24/7." Tr. 361. He stated that he was sleeping only two or three hours each night, and Mr. Cerrato noted that he had a depressed and anxious mood with a labile affect. *Id.*

On October 8, 2013, Mr. Novaco and his mother met with Mr. Cerrato. Tr. 362. He stated, "I don't know what's wrong with me . . . I feel like stripping off my clothes and running down the street screaming . . . I can't explain it." Tr. 362. He stated that he was self-medicating with synthetic marijuana and that he did not want to stop, and thought that it was the only thing that worked. Tr. 362. His report stated that he had a depressed mood and a labile affect, as well as homicidal ideation. *Id.*

On October 15, 2013, Mr. Novaco reported to Mr. Cerrato that he was doing better. Tr. 363. His mood was stable, and Mr. Cerrato noted a big difference from the previous week. *Id.*

On November 12, 2013, Mr. Novaco reported that he felt like someone else was controlling his brain, and that he was increasingly confused and in conflict. Tr. 364. He was not smoking marijuana. *Id.* He had a depressed and anxious mood and a labile affect. *Id.*

On November 22, 2013, Mr. Cerrato partially completed a report for the Social Security Administration, reporting that Mr. Novaco's mental status findings had not changed since Mr. Cerrato's September 2013 report. Tr. 368–70.

On January 7, 2014, Mr. Novaco told Mr. Cerrato that he felt stuck, feared leaving his home, and felt that marijuana helped him. Tr. 486. He had an anxious and depressed mood and a constricted affect. *Id.* Mr. Novaco also stated that he felt hopeless and depressed and threatened suicide, if his girlfriend left him. *Id.* He continued therapy without significant changes through the end of February 2014. Tr. 488–93.

On February 25, 2014, Mr. Cerrato reported that he was treating Mr. Novaco for bipolar I disorder, characterized by rapid mood swings, racing thoughts, irritability, difficulty concentrating, depression, sleep problems, and mania. Tr. 402. He opined that Mr. Novaco would be unable to work because of these characteristics, which would interfere with job requirements, and because Mr. Novaco had a history of arguing with customers, threatening co-workers, and other aggressive behavior. *Id.* Mr. Novaco was not taking any medications. *Id.*

On March 18, 2014, Mr. Novaco and his mother met with Mr. Cerrato and reported that he spends the entire day wrestling with himself. Tr. 494. Mr. Novaco had a depressed mood and a flat affect that day, and no changes were documented on April 22, 2014. *Id.* On May 20, 2014, Mr. Novaco expressed some recent improvement. Tr. 498. That day, his mood was stable and his affect was appropriate. *Id.*

On June 6, 2014, Mr. Cerrato completed a Mental Impairment Questionnaire, diagnosing Mr. Novaco with bipolar II disorder, a history of cannabis abuse, rule-out generalized anxiety disorder. Tr. 503. Mr. Novaco was not taking medications. *Id.* Mr. Novaco had symptoms including anger, difficulty with impulse control, anxiety, and agoraphobia. Tr. 505. Mr. Cerrato opined that Mr. Novaco was not a malingerer and that his symptoms had been present since at least August 11, 2012. Tr. 503, 507. Mr. Cerrato also found that Mr. Novaco had no limitations or mild limitations remembering locations or work procedures, or remembering one- or two-step instructions, being basically neat, being aware of hazards, and taking basic precautions. Tr. 506.

 He also found that Mr. Novaco had moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, sustaining a routine, setting realistic goals, and making independent plans. *Id.* Mr. Novaco had marked limitations in coordinating with others, completing a workday without

interruptions, performing at a consistent pace without rest periods of unreasonable length or frequency, interacting appropriately with the public, maintaining socially appropriate behavior, traveling to unfamiliar places or using public transportation. Tr. 506. Mr. Novaco also had moderate or marked limitations in asking simple questions or requesting assistance, accepting instructions, responding appropriately to criticism from supervisors, getting along with co-workers and peers, and responding appropriately to workplace changes. *Id.*

On July 1, 2014, Mr. Novaco reported to Mr. Cerrato that he had panic attacks from imagining going outside, that he was struggling with making decisions, and that he was experiencing anxiety, panic, and helplessness. Tr. 509. He had a depressed mood. *Id.*

On September 2, 2014, Mr. Novaco reported that he felt paralyzed and that pretending to go to work would make him anxious. Tr. 511. He had an anxious and depressed mood and a flat affect. *Id.*

He continued therapy, without significant changes, through the end of February 2015. Tr. 513, 528, 530, 533.

### 2.     Proceedings Before the SSA

On August 7, 2013, Mr. Novaco filed an application for disability benefits, claiming a disability as of August 11, 2012. Tr. 199–200.

On October 25, 2013, Dr. Thomas Hill, a State agency physician, reviewed Mr. Novaco's record, including records from Yale Hospital, Bridges, Dr. Leshine, Milford Hospital, and Dr. Rama. Tr. 82–92. Dr. Hill noted that Mr. Novaco, whose alleged onset date was August 11, 2012, allegedly had the following impairments: severe anxiety disorder, bipolar disorder, and attention deficit disorder. Tr. 82, 83, 85. Dr. Hill found that Mr. Novaco had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning,

concentration, persistence, and pace. Tr. 87. Dr. Hill also noted that Mr. Novaco had one or two episodes of decompensation. *Id.*

He concluded that the evidence did not establish the presence of "C" Criteria: having "either an organic mental, schizophrenic, etc., or affective disorder(s) . . . ." *Id.* Dr. Hill also found that Mr. Novaco's impairments were aggravated by cannabis abuse and that he would benefit from therapeutic doses of mood stabilizers. *Id.* He found that Mr. Novaco tended to act aggressively when under stress, and that he can distract co-workers when he is upset, but can function, work alone and relate with staff when motivated. Tr. 90.

On October 31, 2013,the SSA denied Mr. Novaco's application for disability insurance benefits. Tr. 107–11.

On November 19, 2013, Mr. Novaco requested reconsideration of the SSA's decision. Tr. 112.

On January 6, 2014, Michelle Nitto Leveille, PsyD., reviewed his record. Tr. 95–105. Dr. Leveille noted his depression and anxiety, and opined that Mr. Novaco had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace. Tr. 100. Dr. Leveille affirmed Dr. Hill's opinion. Tr. 100–01.

On January 7, 2014, the SSA denied his request for reconsideration. Tr. 113–15.

On March 11, 2014, Mr. Novaco requested a hearing before an Administrative Law Judge. Tr. 117. On March 24, 2014, the SSA granted his request. Tr. 118.

On March 13, 2015, the SSA held a hearing on Mr. Novaco's application in New Haven, Connecticut. Tr. 45. Represented by counsel, Mr. Novaco appeared before Administrative Law

Judge ("ALJ") Deirdre Horton. *Id.* Mr. Novaco's girlfriend of several years, Lauren Kopko, also appeared. *Id.* The hearing lasted a total of forty-six minutes. Tr. 45, 81.

Mr. Novaco testified that his most recent job ended, after he could not return to work after six months of leave under the Family Medical Leave Act. Tr. 52. During that time, he had been hospitalized for anxiety and depression after threatening his psychiatrist. Tr. 53. He stated that he was uncomfortable around other people and that other people were watching him and talking about him. Tr. 54–55. He stated that he has lost multiple jobs for reasons related to attendance due to his anxiety, and that he often loses his appetite for days due to stress. Tr. 55–56, 50–51. He also stated that he gets confused and has problems leaving his home. Tr. 59.

He also testified that he lives with Ms. Kopko, who works, and her grandmother. Tr. 48, 60. His girlfriend shops for groceries because Mr. Novaco gets anxious in grocery stores, and he asks for rides if he needs to go somewhere. Tr. 50, 60–61. He stated that he had taken medication in the past, but could not stand the side effects, including because they worsened his mental conditions; so, he stopped, but he still uses marijuana in the morning and the evening. Tr. 57–58, 71.

Ms. Kopko also testified at the hearing. She stated that she had known him for six years, and that, although she works during the day, she regularly calls him to check up on his mental state. Tr. 74–75. She stated that she occasionally needed to calm him down, and that she had noticed a decrease in his ability to cope, and that he had never fully recovered from his anxiety and depression from before and during his hospitalization. Tr. 76. She testified that he rarely leaves the house, that she does the grocery shopping because of his panic attacks, and that he could not tolerate the side effects of medications. Tr. 76, 78–79. She stated that she had observed his agitation, hostility, frustration, sorrow, and sweating. Tr. 79–80.

On May 19, 2015, the ALJ issued a written decision finding that Mr. Novaco was not disabled under Title II. Tr. 21–41. While the ALJ found that Mr. Novaco had severe impairments of a depressive disorder, an anxiety disorder, a personality disorder, and cannabis dependence, Tr. 26, the ALJ concluded at Step Three that he did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in Appendix 1, 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 28.

At Step Four, the ALJ found that Mr. Novaco had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels, but is limited to working in a low stress environment defined as engaging in simple routine tasks, as well as no work with the general public and occasional interaction with coworkers and supervisors." Tr. 30. The ALJ found that he could "relate adequately to others for ordinary work related tasks" and that he could "adjust to ordinary changes in the workplace consistent with simple routine tasks." *Id.*

At Step Five, the ALJ found that while Mr. Novaco could not perform his past relevant work, within the realm of unskilled work "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Tr. 35–36. The ALJ therefore found Mr. Novaco not disabled within the meaning of the Social Security Act. Tr. 37.

Mr. Novaco requested review with the Appeals Council, Tr. 19, which denied review on September 21, 2016, Tr. 1–7.

### B. Procedural History

On November 21, 2016, Mr. Novaco appealed the ALJ's decision denying his benefits to this Court. Compl.

On April 14, 2017, Mr. Novaco moved for a judgment on the pleadings reversing the Acting Commissioner's decision. Pl.'s Mot; Pl.'s Mem.

That same day, Mr. Novaco and the Acting Commissioner filed a Joint Statement of Material Facts with the Court. J. SMF.

On June 13, 2017, the Acting Commissioner moved for an order affirming her decision. Def.'s Mot.; Def.'s Mem.

On June 27, 2017, Mr. Novaco filed a reply to the Acting Commissioner's motion. Reply, dated Jun. 27, 2017, ECF No. 17.

On March 27, 2019, the Court ordered the case caption be amended to reflect that Ms. Berryhill is now the named Defendant in this action. Order to Amend Case Caption, dated Mar. 27, 2019, ECF No. 18.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review *de novo* the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *accord Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (quoting *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.   DISCUSSION

Mr. Novaco argues that the ALJ erred in three ways: (1) failing to assign controlling weight to the report of treating therapist, Mr. Cerrato, a report co-signed by Dr. Tara Kern, MD, b; (2) improperly evaluating Mr. Novaco's credibility; and (3) improperly relying on the medical-vocational guidelines to find that Mr. Novaco could perform work that exists in significant numbers in the national economy. Pl.'s Mem. at 1–7, 7–10, 10–13.

The Court disagrees with Mr. Novaco that the ALJ erred in deciding Dr. Kern's opinion was not entitled to controlling weight, and that the ALJ committed reversible error at Step Four. The Court, however, agrees that the ALJ erred by failing to provide an explanation for her determination, at Step Five, that Mr. Novaco's non-exertional impairments were negligible.

### A.  The Treating Physician Rule

With respect to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *see also Burgess*, 537 F.3d at 128 (same). The treating physician's opinion "is given controlling weight if it is well

supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citations omitted).[4]

The treating physician's opinion, however, is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam). "[T]o override the opinion of the treating physician," the ALJ must consider, under the relevant regulations, factors including "(1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

"'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]'" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F.Supp.3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

### B. LCSW Cerrato and Dr. Kerner's Opinion

While Mr. Novaco acknowledges that Mr. Cerrato—a licensed clinical social worker— alone is not an "acceptable medical source" whose opinions are entitled to controlling weight, he argues that because LCSW Cerrato's September 3, 2013 opinion was co-signed by treating

---

[4] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 CFR § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018).

psychiatrist Dr. Tara Kerner, MD on September 10, 2013, the ALJ should have given it controlling weight. Pl.'s Mem. at 1–2.

The Acting Commissioner contends the ALJ correctly determined that the opinion was not entitled to controlling weight because Dr. Kerner did not treat or examine Mr. Novaco and therefore was not Mr. Novaco's treating psychiatrist.

The Court agrees.

The SSA's regulations define a "treating source" as an "acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). "Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* "We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." *Id.*

Treating sources, then, must also be "acceptable medical sources" for their opinions to be entitled to controlling weight under the treating physician rule. *Id.*; *see Eusepi v. Colvin*, 595 F. App'x 7, 8–9 (2d Cir. 2014) ("Title 20 C.F.R. § 404.1527(c) governs consideration of 'medical opinions,' which are defined as 'statements from physicians and psychologists or other acceptable medical sources.' Physicians' assistants are not 'acceptable medical sources' under this regulation, but rather are 'other sources.' While opinions from other sources are properly considered in assessing claimed disability they need not be given the controlling weight accorded

to opinions from treating medical sources.") (internal citations omitted); *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) ("Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide *medical* opinions. Accordingly, the district court erred when it held that the chiropractor's opinion had 'binding effect . . . in the absence of substantial evidence to the contrary.'") (footnote omitted). As currently defined by the agency, "acceptable medical sources" include licensed physicians and psychologists, but not licensed clinical social workers. *See* 20 C.F.R. § 404.1502(a) (defining "acceptable medical source" as including licensed physician, licensed or certified psychologist, and others, but not licensed clinical social worker).

Where the opinion of a treating health care provider who is not an acceptable medical source is co-signed by a treating health care provider who is an acceptable medical source, it is generally entitled to controlling weight under the treating physician rule. *See, e.g.*, *Luna v. Colvin*, No. 3:14-cv-145 (HBF), 2016 WL 4408987, at *5–7 (D. Conn. Aug. 17, 2016) (finding error and remanding where ALJ failed to apply treating physician rule to opinions of treating LCSW co-signed by treating psychiatrist); *see also Shailer-Solak v. Berryhill*, No. 3:16-cv-1681 (VAB), 2019 WL 1284814, *15 n.4 (D. Conn. Mar. 20, 2019) (parties did not dispute that the opinions of LCSW were made by treating source because they were co-signed by Plaintiff's treating psychiatrist and medication provider).

The co-signing acceptable medical source, however, must also be a "treating" provider for the claimant; i.e., he or she must actually provide some level of regular treatment to the claimant. *See Luna*, 2016 WL 4408987, at *6–7 (noting that co-signing psychiatrist had started treating plaintiff in 2010, prepared four treatment plans with LCSW, and provided medication management approximately 13 times between 2010 and 2012).

The ALJ found that Dr. Kerner was not a treating provider because she found no evidence that Dr. Kerner had either treated or even examined Mr. Novaco. Tr. 35. Mr. Novaco argues that because Dr. Kerner was part of Mr. Novaco's "treatment team" at Bridges, he was a treating provider. *See* Pl.'s Mem. at 2, 6. But he does not directly address the ALJ's finding that Dr. Kerner never treated or even examined Mr. Novaco.

On September 10, 2015, Dr. Kerner submitted a letter to Mr. Novaco's attorney "to inform the Social Security Administration that when I co-sign a report, I am in full agreement with the contents therein." Tr. 8. Mr. Novaco submitted this letter to the Appeals Council, which reviewed it before rejecting his appeal. Dr. Kerner's letter does not, however, reveal whether or not Mr. Novaco was, in fact, a patient she had actually treated.

The ALJ's conclusion that Dr. Kerner did not directly provide Mr. Novaco with any treatment thus is supported by the absence of any such evidence in the record. The Court also agrees with the Acting Commissioner that the co-signature of a non-treating acceptable medical source alone does not transform the opinion of a treating non-acceptable medical source into one with controlling weight as a matter of law.

Accordingly, the ALJ did not err in concluding that Dr. Kerner was not a treating physician whose medical opinions are entitled to controlling weight.

### C. Step Four

Mr. Novaco argues that the ALJ erred at Step Four in determining his RFC because her determination that his testimony was only "partially credible" was not supported by substantial evidence in the record.

The Court disagrees.

A claimant's residual functional capacity ("RFC") "is 'the most [he or she] can still do despite [his or her] limitations.'" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 416.945(a)(1)). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* (citations omitted).

Such determinations are "generally reserved for the Commissioner, not the reviewing court." *Atwater v. Astrue*, No. 10-CV-420S, 2012 WL 28265, at *6 (W.D.N.Y. Jan. 5, 2012) (citing *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)); *see also Wavercak v. Astrue*, 420 F. App'x 94 (2d Cir. 2011) ("In reviewing this challenge, we note that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'") (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). But the ALJ's determinations "'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" S.S.R. 96–7p (Jul. 2, 1996); *see Atwater*, 2012 WL 28265, at *6 (quoting S.S.R. 96–7p); *Pereira v. Astrue*, 279 F.R.D. 201, 209 (E.D.N.Y. 2010) (quoting S.S.R. 96–7p and holding that "[a]bsent such findings, a remand is required."); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with

sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (citations omitted).

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). If such an impairment is identified, "at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). The ALJ must consider statements the claimant or others make about her impairments, her restrictions, her daily activities, her efforts to work, or any other relevant statements she makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in administrative proceedings. *Id.* (quoting 20 C.F.R. § 404.1512(b)(3) and citing 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.).

Here, at the first step, the ALJ determined that Mr. Novaco's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 32. At the second step, however, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are partially credible[.]" *Id.* The ALJ then set forth the findings, as required, for concluding that Mr. Novaco's testimony that he was incapable of all work was only partially credible. *See* Tr. 32–36.

The ALJ ultimately determined that Mr. Novaco has the RFC "to perform a full range of work at all exertional levels, but is limited to working in a low stress environment defined as engaging in simple routine tasks, as well as no work with the general public and occasional

interaction with coworkers and supervisors." Tr. 30. The ALJ also determined that he can "relate adequately to others for ordinary work related tasks" and "adjust to ordinary changes in the workplace consistent with simple routine tasks." *Id.*

Mr. Novaco argues that the ALJ's conclusions at the second step with respect to the credibility of his statements were not supported by substantial evidence in the record. He specifically takes issue with the ALJ's conclusions that: (1) when Mr. Novaco was compliant with medications between April 2013 and June 2013 his symptoms improved, but when he subsequently stopped taking his medications and began self-medicating with marijuana his symptoms worsened, suggesting "a possible unwillingness to do what is necessary to improve his condition" and that his symptoms "were not as disabling as he purported," Tr. 32–33; and (2) that Mr. Novaco's limited daily activities "cannot be objectively verified with any reasonable degree of certainty" and that, even if they were true, "it is difficult to attribute that degree of limitation to [his] medical condition, as opposed to other reasons," Tr. 33. *See* Pl.'s Mem. at 8– 10.

The Court disagrees.

Even if the ALJ erred in assessing Mr. Novaco's medication compliance and daily activities, the ALJ's RFC determination was supported by other substantial evidence in the record. It was thus within the ALJ's discretion not to credit Mr. Novaco's statements in light of such evidence.

### 1. Medication Compliance

The ALJ specifically observed that:

> While the record shows that the claimant has periods of increased anxiety and depression, these improved with prescribed treatment (Exhibits 1F1-2; 2F, pgs. 1-3 and 11F, pgs. 1-3) . . . . The record shows that during the relevant time-period from April 2013 through

> June 2013, the claimant was compliant with prescribed treatment. At the time, LCSW observed that the claimant appeared well groomed with anxious mood, but appropriate affect. However, later, when the claimant stopped taking prescribed psychotropic medications and returned to smoking marijuana, such as in early October 2013, he appeared just adequately groomed with depressed mood and labile affect (Exhibit 6F, pgs. 15, 18, and 22).

Tr. 32. The exhibits initially cited by the ALJ (1F, 2F and 11F), however, do not clearly support the conclusion that Mr. Novaco's anxiety abated with his compliance with prescribed medication. In fact, the record suggests Mr. Novaco has taken no regular prescribed psychotropic medications since late February 2013. *See* J. SMF at 5–6; Tr. 450 (Mr. Cerrato notes client reports on March 7, 2013 that "I'm off all my meds . . . I had such a bad reaction, I just don't want to deal with them."); Tr. 452 (Mr. Cerrato notes client reports on March 12, 2013 that he "stopped all meds").

The ALJ may be characterizing this as a period in which Mr. Novaco did not use marijuana, which the ALJ claims was a recommendation made to Mr. Novaco by psychiatrist Dr. Rafique Tai, M.D. during a February 19, 2013 psychiatric evaluation at Bridges. Indeed, on March 12, 2013, Mr. Novaco states that he had stopped using synthetic marijuana "after reading side effects." The ALJ writes:

> As considered, in the February 2013 psychiatric evaluation, the claimant told treating physician Rafique Tai, M.D. that he had a long history of anxiety and depression, which became increasingly debilitating and required inpatient psychiatric treatment in 2012. At the time, the claimant reported he received psychotropic medication treatment and psychotherapy. The claimant further reported using synthetic marijuana during the same time of taking prescribed medication. Upon examination, Dr. Tai noted that the claimant did not manifest any thought disorder, and appeared mildly anxious with appropriate affect, intact judgment, but poor insight. Dr. Tai discussed with the claimant continuing his prescribed medication treatment, and refraining from using marijuana, despite his claims the marijuana was helping more than the prescribed medication. Based on the objective findings, Dr. Tai diagnosed the claimant with

23

anxiety disorder and opined a guarded prognosis secondary to marijuana use (Exhibit 11F, pgs. 1-3).

Tr. 33–34. But the report of Dr. Tai simply indicates that she prescribed him a new medicine to try. *See* Tr. 414 ("He believed that marijuana was helping him more than the medication but agreed to the recommendation of the medication for anxiety. However, his prognosis is guarded because of his use of marijuana."); Tr. 415 ("Plan: The patient was educated about the medication for anxiety and agreed to take citalopram 20 mg for two weeks, followed by 40 mg and return for an appointment in four weeks.").

Whether or not Dr. Tai recommended that Mr. Novaco stop his marijuana use, it does appear that Mr. Novaco stopped using marijuana between March 2013 and June 2013. But the ALJ's conclusion was that Mr. Novaco was improving while compliant with "prescribed treatment." During this entire period of marijuana non-use, however, Mr. Novaco appears to have not taken any of the psychotropic medications prescribed to him—nor is there any indication that he was regularly seeing a psychiatrist to monitor such treatment.

Aside from the evidence about this alleged compliance period, it appears that the ALJ also relied on statements by Mr. Novaco's girlfriend, Ms. Kopko, in concluding that medication compliance had been effective for Mr. Novaco by allowing him improved thought processes and enabling him to "knowingly withhold certain information." *See* Tr. 31–32 ("The claimant and his live-in girlfriend Lauren Kopko testified that the claimant was unable to use any prescribed psychotropic medications due to severe side effects of swelling of the legs, nausea and vomiting. However, Ms. Kopko later testified that while on prescribed medications, the claimant was able to 'process better,'" and comprehend conversations and instructions better. She also noted that while on prescribed medications, the claimant's thought process had improved to the point, he could knowingly withhold certain information.").

The ALJ then cites a note from Dr. Tai's appointment with Mr. Novaco as corroboration of this "improved thought process to willing [sic] withhold information" while on treatment. *See* Tr. 32 ("His improved thought process to willing [sic] withhold information is referenced at the February 2013 psychiatric evaluation, when Dr. Tai stated that the claimant although cooperative and responsive to questions, 'remained vague about certain responses and filtered out some of the information or history.'")

As a whole, however, Ms. Kopko did not believe any medications had been of help to Mr. Novaco and that doctors had not engaged in any sustained effort to determine viable alternative medicines.

> Q: And over the years he's tried medications. Have you observed him during times when he's tried these medications?
> A: Yes, I have.
> Q: And have you – what have you noticed about the medications, if anything?
> A: I've noticed that, unfortunately, he always ends up with one of the side effects. I remember one – I don't remember the particular medication, but I know one actually caused his legs to swell up. And nothing that has actually hospitalized him, but some things that have been pretty scary that I know myself would be afraid to take again. And I know he's been on the phone back and forth because of the side effects. And they give him something else. But I also truly feel that they never really took the time to really figure out what would work. I think it was more of, like, "Well, just do – take this. Just try this. Just try this." And not really knowing if it was really something that would actually benefit him, really, that well.
> Q: And aside from the side effects, have you ever noticed that any of them did any help for him?
> A: Truth be told, not really. Maybe a little bit. Like, where he could – you could maybe talk to him about something directly, and he might be able to withhold some of that information for a longer period of time because he could process it a little better. But I wouldn't say that anything actually drastically helped in any way that it actually made him feel good enough to face the world, I guess, is the way to say it.
> Q: And when you say that he was able to process information better, what do you observe about his ability to process information?

> A: I know that there's certain triggers, certain things that you could talk about with him, that the minute you mention it, it's anxiety to the fullest. And one in particular being finances. If you start talking numbers or bringing up any sort of money, it scares him, and he gets anxiety. And he doesn't retain anything that you're, pretty much talking to him about. And there's a few things that can do that to him.

Tr. 78–79. Reading the testimony as a whole also indicates that when Ms. Kopko first used the word "withhold," she actually may have meant "retain." Thus, it appears that while Ms. Kopko was talking about retaining information, Dr. Tai was actually talking about withholding it—i.e., selectively sharing only the information he wanted to share.

### 2. Daily Activities

Because there does not appear to be evidence in the record of a period of medication compliance, the ALJ may also have erred in how some of the evidence as to Mr. Novaco's daily activities was construed. The ALJ noted several reasons why she did not find his testimony here credible. *See, e.g.*, Tr. 33 ("Despite alleging significant mental health problems, the claimant is capable of performing a wide range of daily activities. The claimant is able to perform his own personal care, and testified he cares for and has trained two Pug puppies.").

### 3. Other Evidence Considered

But the ALJ also considered other substantial evidence in the record as to Mr. Novaco's RFC. In particular, the ALJ reviewed the state agency consultants' evaluations and found they supported the RFC conclusion and were consistent with the record as a whole. *See* Tr. 35.

Because the ALJ's ultimate determination was supported by substantial evidence in the record, the ALJ remained within her "discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record." *Gelian*, 606 F.3d at 49. Any factual errors, such as those discussed above, therefore were harmless.

As there was substantial evidence in the record to support the ALJ's RFC determination at Step Four, the Court declines to reverse on this basis.

### D. Step Five

Mr. Novaco argues that the ALJ erred at Step Five by relying only on the Medical-Vocational Guidelines after concluding that Mr. Novaco had only non-exertional limitations that had "little or no effect on the occupational base of unskilled work at all exertional levels." Pl.'s Mem. at 10–11.

He argues that the ALJ "made a conclusory finding that Mr. Novaco has no significant impairments," despite the fact that she had previously identified him to have moderate difficulties in social functioning, moderate difficulties in concentration, persistence, and pace, and that her RFC determination limited him to working in a "low stress environment with only simple tasks, no work with the general public, and only occasional interactions with co-workers and supervisors." Pl.'s Mem. at 11 (citing Tr. 37, 29–30). He also argues that the ALJ's failure to cite vocational evidence establishing his non-exertional limitations as negligible precluded the ALJ from making the Step Five determination without a vocational expert. Pl.'s Mem. at 12 (citations omitted).

The Acting Commissioner argues that the ALJ's limitation of Plaintiff to simple, routine tasks "encompasses the basic mental demands of unskilled work," and that the limitation to only occasional contact with others and no work with the general public had little or no effect on the occupational base for work at all exertional levels. Def.'s Mem. at 15. The Acting Commissioner therefore argues that the lack of a vocational expert was appropriate here, citing "courts within this Circuit [that] have recognized that limitations such as restricting a claimant to occasional

contact with others and to simple and unskilled work do not pose a significant impact to the potential occupational base[.]" *Id.*

The Court disagrees.

At Step Five, the ALJ considers the claimant's "residual functional capacity and [ ] age, education, and work experience" to evaluate whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v). If the claimant is able to adjust to other work, then the ALJ will find the person not disabled; if the claimant cannot make the adjustment, the ALJ will find the person disabled. *Id.* While the claimant bears the burden for the first four steps of the disability determination, the burden shifts at Step Five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Gonzalez ex rel. Guzman v. Dep't of Health & Human Servs.*, 360 F. App'x 240, 243 (2d Cir. 2010) ("Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity.") (citing 68 Fed. Reg. 51155 (Aug. 26, 2003); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

An ALJ may determine if there are a significant number of jobs available to a claimant either by applying the Medical Vocational Guidelines or by relying on the testimony of a vocational expert. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).

However, "when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the [Acting Commissioner] must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and

perform." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *see also Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 734–35 (S.D.N.Y. 2018) ("Exclusive reliance on the Grids is not appropriate where nonexertional limitations 'significantly diminish [a claimant's] ability to work.') (quoting *Bapp*, 802 F.2d at 603, and citing *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)).

Nonexertional limitations are those "[l]imitations or restrictions which affect the claimant's ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling[.]" 20 C.F.R. § 220.135(a); *see also Jusino v. Berryhill*, No. 17 Civ. 4553 (GBD)(HBP), 2018 WL 4658805, at *12 n.22 (S.D.N.Y. Jul. 10, 2018) ("Nonexertional limitations are those which 'affect only [the claimant's] ability to meet the demands of jobs other than the strength demands,' including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.") (quoting 20 C.F.R. §§ 404.1569a(c), 416.969a(c)), *report and recommendation adopted*, 2018 WL 3628901 (S.D.N.Y. Jul. 30, 2018).

"Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp*, 802 F.2d at 605; *see also Zabala v. Astrue*, 595 F.3d 402, 410–11 (2d Cir. 2010) ("[T]he 'mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines.'") (quoting *Bapp*, 802 F. 2d at 603); *Selian*, 708 F.3d at 421 ("A nonexertional impairment is non-negligible "when it . . . so narrows

a claimant's possible range of work as to deprive him of a meaningful employment

opportunity.") (quoting *Zabala*, 595 F.3d at 411).

Here, the ALJ failed to explain the finding that Mr. Novaco's non-exertional limitations

did not significantly diminish his opportunities. The ALJ simply stated:

> The claimant's ability to perform work at all exertional levels has
> been compromised by his non-exertional limitations. However,
> these limitations have little or no effect on the occupational base of
> unskilled work at all exertional levels. A finding of 'not disabled' is
> therefore appropriate under the framework of section 204.00 in the
> Medical-Vocational Guidelines and is supported by Social Security
> Ruling 85-15.

Tr. 37. By failing to explain this finding, the Court cannot determine whether reliance on the

Medical-Vocational Guidelines was appropriate.

The Court takes no position as to whether an expert's testimony was, in fact, required.

But absent any explanation of the conclusory finding that Mr. Novaco's non-exertional

limitations had a negligible impact on the occupational base of unskilled work, the Court cannot

assess whether or not an expert's testimony was required—and therefore cannot conclude

whether the Step Five determination was supported by substantial evidence in the record. The

ALJ therefore erred by failing to provide that explanation. *See Sanville v. Comm'r of Soc. Sec.*,

No. 2:16-cv-251, 2017 WL 4174783, at *10 (D. Vt. Sep. 20, 2017) ("At step five, however, the

ALJ did not explain his apparent conclusion that these nonexertional limitations had 'little or no

effect' on the range of work open to Sanville. This was error. In relying on the Guidelines rather

than on the testimony of a VE, the ALJ was obligated to explain his finding that Sanville's

nonexertional limitations had only a negligible impact on the range of work permitted by her

exertional limitations.") (citations omitted); *Chaparro v. Colvin*, 156 F. Supp. 3d 517, (S.D.N.Y.

2016) ("In relying upon the Grids, rather than the testimony of a vocational expert, ALJ Edgell

was obligated to explain her finding that Chaparro's nonexertional limitations had only a negligible impact on the range of work permitted by his exertional limitations.").

Two Second Circuit cases underscore the importance of the ALJ providing a clear explanation the non-exertional limitations of the claimant and the impact they have on the claimant's employment opportunities. *See Lawler v. Astrue*, 512 F. App'x 108, 111–12 (2d Cir. 2013) (affirming Commissioner's decision); *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir. 1996) (remanding Commissioner's decision for rehearing).

In *Lawler*, because the ALJ had discussed the evidence supporting her conclusion that the claimant's "'non-exertional limitations did not significantly narrow the range of work [he] can perform,'" the Second Circuit was able to conclude that her "determination was supported by substantial evidence in the record." *Lawler*, 512 F. App'x at 111; *see id.* at 112 ("As the ALJ noted, both Dr. Malachovsky, one of Lawler's treating physicians, and the state agency review psychologist had concluded that despite his mental issues Lawler should be able to perform unskilled work. While other sources had stated that Lawler had moderate difficulties in concentration and dealing with others, the ALJ correctly noted that either of these opinions were still consistent with a capability to perform unskilled work or that there were reasons to afford them less weight than others.").

In *Pratts*, however, the ALJ did not articulate the nonexertional impairments faced at all, meaning that the Second Circuit could not evaluate whether those impairments significantly diminished his meaningful capacity to work and thus was unable to conclude that the ALJ's determination was supported by substantial evidence in the record. *Pratts*, 94 F.3d at 38–39 (2d Cir. 1996) ("In the present case, the ALJ did not specifically articulate the nonexertional impairments that Pratts suffered. Nonetheless, in light of her reference to 'his non-exertional

limitations,' she apparently believed that he had some. The ALJ found that the grids directed a conclusion that Pratts was not disabled even though she neither identified his nonexertional limitations nor considered whether a vocational expert was necessary . . . . We therefore conclude that on remand, the ALJ must conduct a re-evaluation as to whether the Commissioner has demonstrated that Pratts's ability to perform the full range of light work was not significantly diminished by his nonexertional impairments.").

Here, the ALJ specifically articulated Mr. Novaco's nonexertional limitations caused by his depressive disorder, anxiety disorder, personality disorder, and cannabis dependence: He can only work in a low stress environment defined as engaging in simple routine tasks, he cannot work with the general public, and can only have occasional interaction with coworkers and supervisors. Tr. 26. But unlike the ALJ in *Lawler*, she did not articulate why she concluded that these limitations were negligible, and thus did not require her to seek out the testimony of a vocational expert. *Hernandez v. Colvin*, No. 13-cv-3035 (RPP), 2014 WL 3883415, at *15 (S.D.N.Y. Aug. 7, 2014) ("Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding.") (collecting cases); *Cruz v. Colvin*, No. 12 Civ. 7346 (PAC)(AJP), 2014 WL 774966, at *3 (S.D.N.Y. Feb. 21, 2014) ("To the extent that the ALJ treated the grids as dispositive because he found that Cruz's nonexertional limitations did not reduce his work capacity, he was required to explain that in his opinion."), *adopting report and recommendation*, 2013 WL 3333040 (S.D.N.Y. Jul. 2, 2013).

Such testimony may have been particularly useful, moreover, given: (1) the ALJ's findings that he could only perform "simple routine tasks," Tr. 32–33; (2) the opinions of Mr. Cerrato, the treating therapist, who "consistently opined" that Mr. Novaco's impairments caused

"rapid mood swings, inability to concentrate, sleep problems, and irritability," Tr. 34, which the ALJ assigned "some weight," Tr. 35; and (3) Mr. Novaco's GAF score of 38 in June 2014, which "is indicative of serious symptoms," though the ALJ concluded that other treatment records were more probative as to Mr. Novaco's condition overall and RFC, Tr. 34.

Accordingly, the ALJ's "conclusory" finding that the impact of his non-exertional limitations was negligible, without further explanation, failed to satisfy the Acting Commissioner's obligations at Step Five.

### E. Issue of Remand

Given the deficiency in the ALJ's decision at Step Five identified above, rehearing is warranted.

As the Second Circuit has noted, "[w]here application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal*, 134 F.3d at 504; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("[W]e have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). However, where "application of the correct standard does not lead inexorably to a single conclusion . . . the proper course is to direct that this case be remanded to the SSA to allow the ALJ to reweigh the evidence . . . developing the record as may be needed." *Schaal*, 134 F.3d at 505; *see also Rosa*, 168 F.3d at 82–83 ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.").

Here, the Court finds that "evidence of Plaintiff's limitations is not so overwhelming that further proceedings would be pointless." *Baker v. Comm'r of Soc. Sec.*, No. 6:14-CV-1263

(GTS/WBC), 2015 WL 7574467, at *7 (N.D.N.Y. Nov. 3, 2015), *report and recommendation adopted*, 2015 WL 7573223, at *1 (N.D.N.Y. Nov. 25, 2015).

Accordingly, the Court finds remand for rehearing to be the most appropriate course of action here.

## IV.    CONCLUSION

For the reasons explained above, Mr. Novaco's motion for judgment on the pleadings is **GRANTED IN PART AND DENIED IN PART**. His motion is granted with respect to the Acting Commissioner's Step Five finding, but denied as to his other claims of error. The Acting Commissioner's motion for an order affirming her decision is **DENIED**. The decision of the Acting Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this decision.

The Clerk of the Court is respectfully directed to enter judgment for Mr. Novaco, remand this case to the Acting Commissioner for rehearing and further proceedings in accordance with this decision, and close this case.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after the remand, any subsequent Social Security appeal is to be assigned to the undersigned.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of March, 2019.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge